## LAMPASAS *v.* BELL.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

No. 115. Argued December 3, 1900.—Decided February 11, 1901.

The ruling in *Western Union Telegraph Company* v. *Ann Arbor Railroad Company,* 178 U. S. 239, that when a suit does not really and substantially involve a dispute or controversy as to the effect or construction of the Constitution or laws of the United States, upon the determination of which the result depends, it is not a suit under the Constitution and laws; and that it must appear on the record, by a statement in legal and logical form, such as is required in good pleading, that the suit is one which does really and substantially involve a dispute or controversy as to a right which depends on the construction of the Constitution, or some law or treaty of the United States, before jurisdiction can be maintained on this ground, is cited and followed.

The objection of the unconstitutionality of a statute must be made by one having the right to make it, not by a stranger to its grievance.

As the city of Lampasas has no legal interest in the constitutional question which it raised, and upon which it claims the right to come directly to this court from the Circuit Court under the act of March 3, 1891, c. 517, to permit it to do so would make a precedent which would lead to the destruction of the statute.

THIS suit was brought to recover the amount of certain unpaid coupons for interest on "Lampasas City Water Work Bonds." The main controversy on the merits depends upon whether the plaintiff in error is the same municipal corporation which issued the bonds or is its successor in liability. There are minor questions turning upon the provisions of ordinances and the observance of their requirements. Besides, a question under the Constitution of the United States is claimed to have been raised

in the Circuit Court by the plaintiff in error, and upon this is based the right to bring the case here rather than take it to the Circuit Court of Appeals. The facts are stipulated and are very voluminous, but the view we take of the constitutional question enables us to omit much detail.

The city of Lampasas was incorporated by special act of the legislature in 1873, under the name of the "corporation of the city of Lampasas," with boundaries containing an area of 553 acres. Its officers were to be elective, and consist of a mayor, a board of aldermen of eight members, five of whom should constitute a quorum. Their term of office was to be two years and until their successors should be elected and qualify. The act made no provisions for the dissolving of the corporation. The city was given power to construct water works, impose and collect taxes, not exceeding one per cent per annum, and to issue bonds for public improvements.

Officers were elected, and the municipal government was exercised by them from 1873 to 1876. In 1876 a mayor and aldermen were elected who favored abolishing the municipal government. They formally resolved to resign and did so, and abandoned their offices. What municipal government, if any, existed between 1876 and 1883 the record does not show. It is, however, stipulated that the city was the "county seat of Lampasas County and had a population in 1876 of about 800; that until the year 1882 the said town was without railroad facilities, when upon advent of a railroad it began to grow rapidly, and by April, 1883, had a population of about 4500 people with street railroad and other improvements. About 1884 the population began to decline, and continued to decline until about 1890." Until 1882 the business part of the city was generally confined to the court-house square and to streets laid out from it and were within the territorial limits as originally incorporated. In 1882 and afterwards business houses were built outside of said limits but inside the boundaries as incorporated in 1883, hereinafter mentioned, and business has been transacted there since.

In February, 1883, under the provisions of the general laws of Texas, Title XVII of the Revised Statutes, a petition of

more than fifty qualified voters, living in and around the limits of the city, was presented to the county judge who, in accordance with the prayer thereof, ordered an election to determine whether the persons living within the limits in the petition set out should incorporate as a city of more than 1000 inhabitants. The election was held, resulting in a majority vote for incorporation — persons voting who lived inside and outside of the limits of the special charter. Upon the return of the election the county judge declared the result, and declared the city duly incorporated within the limits petitioned for, which embraced practically all of the lands within the special charter, and extended nearly one half mile west, north and east thereof, to and including the railroad depot—an area of 1495 acres.

A municipal government was organized with the officers prescribed by the law—some of the aldermen residing outside of the limits contained in the special charter—and exercised all of the functions of a city of 1000 inhabitants organized under the general laws of the State, without any one contesting or disputing the validity of its lawful right to do so, until November 4, 1889, when proceedings in the nature of *quo warranto* were instituted to declare the incorporation of 1883 invalid on the ground that the special charter of 1873 had never been repealed.

The suit was instituted without the direction of the attorney general of the State or other executive officers, and without making any of the creditors of the corporation parties. The judgment of ouster was entered against the officers of the city, which was affirmed on appeal by the Supreme Court of the State. *Largen* v. *Texas*, 76 Texas, 323.

The ousted officers thereafter ceased to act, and, upon authority of the county judge, officers were elected on the 22d of March, 1890, as provided in the charter of 1873, and by persons living within the limits defined by said charter, and the mayor and aldermen so elected organized March 19, and on the 22d by unanimous vote resolved to accept the provisions of " Title XVII of the Revised Statutes of the State of Texas in lieu of the charter granted by the legislature." A copy of the resolutions was duly certified and recorded, as required by law,

and the city at once assumed to act under the general charter provided in Title XVII, and is now acting thereunder.

On December 26, 1890, there was added to the city by a vote of the citizens of the added territory a greater part of the lands west which were included within the limits of 1883, and one tier of blocks additional and the city assumed, and has since exercised jurisdiction over that part lying north and east of the limits of 1873, and which was included within the limits of 1883. The area added contained 428 acres, and embraced the greater part of the residence property of the city outside of the original charter limits of 1873. The property lying north and east of the original limits, and not included within the incorporation of 1890, contains seventy-seven residence houses, occupied by persons, ninety per cent of whom follow some kind of business within the town as defined by the limits of 1873.

. The books and papers of the city government under the charters of 1873 and 1883 were lost, except the assessment rolls of 1889, from which it appears that the assessed value of all lands within the city limits of 1889 was $664,420, personal property about $400,000, and that the assessment was divided as follows: As to lands, no division being shown as to personal property, viz., within the limits of 1873, $452,444; within that part added in December, 1890, $157,915; and within the parts north and east, $68,970. The assessment roll also showed the names of 438 voters, divided as follows: Old limits of 1873, 175; part added in December, 1890, 167; parts north and east, 96.

In January, 1885, acting under the then charter, and not under the charter of 1873, the city, in good faith, upon the demand of the business men of the city for fire protection, and to furnish water to the city, then having a population of 4500, determined to build a system of water works, and to pay for the same by the sale of bonds, and to this end, after full and fair discussion, passed the ordinances under which the bonds in controversy were issued.

The other facts relate to the passage of the ordinance providing for the building of the water works for which the bonds were issued; the advertisement of bids under the ordinance; the inability of the city to get other than cash bids; the awarding, in

consequence, of the contract to a bidder who was willing to build a system for $40,000, whereas the actual cost of the work, allowing nothing for profits to the contractor, was $26,276; the location of the works, some portion being shown to be inside the limits of the new incorporation, and some portion outside such limits; the payment of interest on the bonds for 1889; the decision of the city in 1892 by vote to take charge of the public schools and maintain them, and in 1893 to build a school building, and the issuing of bonds therefor amounting to $18,000, bearing interest at six per cent, and by the proceeds of which a school building was erected, it being believed and the fact certified to the state comptroller that the city had no outstanding bonds; the form of the bonds and their indorsements, and the formalities of their execution, and what appeared as to their registration in the office of the state comptroller, and what appeared as to the assessed value of the property of the city.

It was also stipulated that the defendant in error is the owner and holder of 102 coupons, each for the sum of $35, maturing at different dates, which coupons except as to due date and number of bond are of the following form:

"$35.          The City of Lampasas          $35.
will pay the bearer thirty-five dollars at the office of S. M. Swenson & Son, in the city of New York, or at the treasurer's office, in the city of Lampasas, on the 1st day of ——, 189–, being six months' interest on bond No. —.
                              "S. S. Potts, Secretary."

And it was further stipulated that of those coupons, "forty-two in number, being numbers 9 to 15, inclusive, on bonds Nos. 8 to 13, inclusive, became due more than four years before the institution of this suit, and if plaintiff is entitled to recover in this action he is entitled to recover the sum of $2100 principal and $452.70 interest, due on the remaining sixty coupons mentioned in his petition."

From the facts the Circuit Court found the following:

"That within the city of Lampasas, as now organized and as it has existed since 1890, there is embraced substantially all of the persons and property embraced within the limits of said city

as it existed under the charter adopted in 1883 by vote of the people, and which was recognized and acted upon by them as a valid city government from its adoption until the *quo warranto* proceedings against Largen and his associate officers in 1889, during which time the officers assuming to act as officers under said general charter were elected in good faith by all persons residing within the limits of the charter of 1883, and as such officers in good faith discharged the duties of their respective offices without dispute by any person residing within the restricted limits of the charter of 1873 or by persons living outside of the same."

And as conclusions of law found:

"1. The coupons in suit constitute a valid and existing liability against the present city of Lampasas, except that coupons Nos. 9 to 15, inclusive, being 42 in number, are barred by the statute of limitation, and the remaining 60 coupons sued upon, not being barred by the statute, are valid, and the defendant should be required to pay the same. *Shapleigh* v. *San Angelo*, 167 U. S. 646; *City of Lampasas* v. *Talcott*, decided by Circuit Court of Appeals, Fifth Circuit, on the — day of ——, 18—.

"2. Judgment is therefore rendered in favor of the plaintiff against the defendant, the city of Lampasas, for the sum of $2552.70, with interest thereon, at the rate of six per cent per annum, from the date hereof, and all costs of suit. To the judgment rendered and the additional conclusion of fact the defendant in open court excepts."

The Circuit Court then allowed this writ of error.

*Mr. John C. Chamberlain* and *Mr. J. C. Matthews* for plaintiff in error. *Mr. Clarence H. Miller, Mr. W. H. Browning* and *Mr. Franz Fiset* were on their brief.

*Mr. Henry B. B. Stapler* for defendant in error. *Mr. Robert G. West* and *Mr. T. B. Cochran* were on his brief.

Mr. Justice McKenna delivered the opinion of the court.

The principle and contention of the assignments of error,

which are based on the Constitution of the United States, are expressed in the fourth assignment, as follows:

"The court erred in its last conclusion of facts, its conclusions of law, and the judgment rendered thereon because the organization formed in 1883 under and by virtue of which the bonds, the coupons of which are sued on, were issued, was not only voidable, but wholly void, for the reason that such organization was attempted to be formed under the general laws of the State of Texas, with power to levy and collect taxes, which general laws of the State of Texas then in force and embraced in Title XVII of the Revised Statutes of 1879, relating to the formation of municipal corporations, and the levy and collection of taxes thereby, were in violation of section 1 of the Fourteenth Amendment to the Constitution of the United States, in that the boundaries of such corporations were not fixed by the legislature, nor do said statutes make any provisions by which said boundaries can be fixed by any tribunal or official before whom the residents of the territory proposed to be incorporated could be heard as to whether they should be included in or made subject to taxation in the proposed corporation."

The same claim was made in substantially the same words in the answer of the plaintiff in error in the court below, and the specific injury alleged was "that the taxpayers residing within the boundaries fixed by said act of 1873 will be required to pay more than one half of the principal and interest due and to become due on said bonds, whereby they will be deprived of their property without due process of law."

This court has only jurisdiction by appeal or writ of error directly from the Circuit Court in certain cases, one of which is when "the Constitution or law of a State is claimed to be in contravention of the Constitution of the United States." Sec. 5 of the Judiciary Act of March 3, 1891, c. 517, 26 Stat. 826, 828. But the claim must be real and substantial. A mere claim in words is not enough. We said by the Chief Justice in *Western Union Telegraph Co.* v. *Ann Arbor Railroad*, 178 U. S. 239: "When a suit does not really and substantially involve a dispute or controversy as to the effect or construction of the Constitution or laws of the United States, upon the determination

of which the result depends, it is not a suit arising under the Constitution or laws. And it must appear on the record, by a statement in legal and logical form, such as is required in good pleading, that the suit is one which does really and substantially involve a dispute or controversy as to a right which depends on the construction of the Constitution or some law or treaty of the United States, before jurisdiction can be maintained on this ground. *Gold Washing & Water Co.* v. *Keyes,* 96 U. S. 199; *Blackburn* v. *Portland Gold Mining Co.,* 175 U. S. 571."

It is contended that the residents of the territory incorporated in 1883, were not given an opportunity to be heard "whether they should or should not be included in or made subject to taxation in the proposed corporation." It is hence deduced that the incorporation of 1883 was wholly void and in consequence the bonds sued on were also wholly void, because the law of the State under which the incorporation was made, to wit, Title 17 of the Revised Statutes of 1879, relating to the formation of municipal corporations, and the levy and collection of taxes thereby, was in violation of section 1 of the Fourteenth Amendment to the Constitution of the United States. But what concern is it of the plaintiff in error whether the residents of such territory were or were not given an opportunity to be heard? It had no proprietary right or interest in "territory proposed to be incorporated;" *it* was put to no hazard of taxation without a hearing, nor can it stand in judgment for those who had such interest or were put to such hazard. It was certainly the right of the residents of the territory to submit to incorporation and accept its burdens and its benefits. And the record shows that there was no question of its validity for six years. When questioned it was not on the ground that it was incorporated under an unconstitutional statute—not on the ground that it was imposed without a hearing on unwilling subjects—but on the ground that the prior incorporation of 1873 had not ceased to exist.

We said in *Clark* v. *Kansas City,* 176 U. S. 114, (quoting from Cooley's Constitutional Limitations, section 196,) that "'a court will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect, and

who has therefore no interest in defeating it.'" That is, a legal interest in defeating it. The objection of unconstitutionality of a statute must be made by one having the right to make it, not by a stranger to its grievance. "To this extent only is it necessary to go, in order to secure and protect the rights of all persons, against the unwarranted exercise of legislative power, and to this extent only, therefore, are courts of justice called on to interpose." *Wellington, Petitioner*, 16 Pick. 87, 96,

It follows necessarily that the plaintiff in error has no legal interest in the constitutional question which it raised, and upon which it claims the right to come directly to this court from the Circuit Court under section 5 of the act of 1891, *supra.* To permit it to come here directly from the Circuit Court would make a precedent which would lead to the destruction of the statute. We repeat, the questions which can be raised under any of the subdivisions of section 5 of the act must be real, the controversies they present must be substantial, not only from the nature of the principles invoked, but from the relation of. the party to them by whom they are invoked.

*Writ of error dismissed.*