BARROWS ᴇᴛ ᴀʟ. *v.* JACKSON.

No. 517.   Argued April 28–29, 1953.—Decided June 15, 1953.

*J. Wallace McKnight* argued the cause for petitioners. With him on the brief were *John C. Miles* and *Charles Leland Bagley.*

*Loren Miller* argued the cause for respondent. With him on the brief were *Thurgood Marshall* and *Franklin H. Williams.*

Briefs of *amici curiae* urging reversal were filed by *John W. Preston* for Affiliated Neighbors et al.; and *Walter H. Pollmann, Gerald L. Seegers* and *Paul M. Gerwitz, Jr.* for O'Fallon Park Protective Association et al.

Briefs of *amici curiae* urging affirmance were filed by *A. L. Wirin* for the American Civil Liberties Union (Southern California Branch); by *Fred Okrand* for the Greater Los Angeles C. I. O. Council, *Saburo Kido* for the Japanese American Citizens' League, and *David Ziskind* for the Los Angeles Urban League et al.; by *Phineas Indritz* for the American Veterans Committee, Inc.; by *Arnold Forster, Harry Graham Balter, Mr. Zis-*

*kind* and *Theodore Leskes* for the American Jewish Committee et al.; and by *Irving Kane, Lewis H. Weinstein, Will Maslow, Leo Pfeffer* and *Joseph B. Robison* for the National Community Relations Advisory Council.

MR. JUSTICE MINTON delivered the opinion of the Court.

This Court held in *Shelley* v. *Kraemer,* 334 U. S. 1, that racial restrictive covenants could not be enforced in equity against Negro purchasers because such enforcement would constitute state action denying equal protection of the laws to the Negroes, in violation of the Fourteenth Amendment to the Federal Constitution. The question we now have is: Can such a restrictive covenant be enforced at law by a suit for damages against a co-covenantor who allegedly broke the covenant?

Petitioners[1] sued respondent at law for damages for breach of a restrictive covenant the parties entered into as owners of residential real estate in the same neighborhood in Los Angeles, California. The petitioners' complaint alleged in part:

> "That by the terms of said Agreement each of the signers promised and agreed in writing and bound himself, his heirs, executors, administrators, successors, and assigns, by a continuing covenant that no part of his said real property, described therein, should ever at any time be used or occupied by any person or persons not wholly of the white or Caucasian race, and also agreed and promised in writing that this restriction should be incorporated in all papers and transfers of lots or parcels of land hereinabove referred to; provided, however, that said restrictions should not prevent the employment by

---

[1] Petitioner Pikaar was not a signer of the covenant but is successor in interest of a signer.

the owners or tenants of said real property of domestic servants or other employees who are not wholly of the white or Caucasian race; provided, further, however, that such employees shall be permitted to occupy said real property only when actively engaged in such employment. That said Agreement was agreed to be a covenant running with the land. That each provision in said Agreement was for the benefit for all the lots therein described."

The complaint further alleged that respondent broke the covenant in two respects: (1) by conveying her real estate without incorporating in the deed the restriction contained in the covenant; and (2) by permitting non-Caucasians to move in and occupy the premises. The trial court sustained a demurrer to the complaint, the District Court of Appeal for the Second Appellate District affirmed, 112 Cal. App. 2d 534, 247 P. 2d 99, and the Supreme Court of California denied hearing. We granted certiorari, 345 U. S. 902, because of the importance of the constitutional question involved and to consider the conflict which has arisen in the decisions of the state courts since our ruling in the *Shelley* case, *supra.* Like the California court in the instant case, the Supreme Court of Michigan sustained the dismissal of a claim for damages for breach of a racial restrictive covenant, *Phillips* v. *Naff,* 332 Mich. 389, 52 N. W. 2d 158. See also *Roberts* v. *Curtis,* 93 F. Supp. 604 (Dist. Col.). The Supreme Court of Missouri reached a contrary result, *Weiss* v. *Leaon,* 359 Mo. 1054, 225 S. W. 2d 127, while the Supreme Court of Oklahoma has held that a claim for damages may be maintained against a white seller, an intermediate straw man, and a non-Caucasian purchaser for a conspiracy to violate the covenant, *Correll* v. *Earley,* 205 Okla. 366, 237 P. 2d 1017.

The trial court in the case here held that a party to a covenant restricting use and occupancy [2] of real estate to Caucasians could not maintain a suit at law against a co-covenantor for breach of the covenant because of our ruling in *Shelley, supra*.  In *Shelley,* this Court held that the action of the lower courts in granting equitable relief in the enforcement of such covenants constituted state action denying to Negroes, against whom the covenant was sought to be enforced, equal protection of the laws in violation of the Fourteenth Amendment.  This Court said:

> "We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment.  So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated. . . ."  334 U. S. 1, 13.

That is to say, the law applicable in that case did not make the covenant itself invalid, no one would be punished for making it, and no one's constitutional rights were violated by the covenantor's voluntary adherence thereto.  Such voluntary adherence would constitute individual action only.  When, however, the parties cease to rely upon voluntary action to carry out the covenant and the State is asked to step in and give its sanction to the enforcement of the covenant, the first question

---

[2] There is no question of restraint of *sale* here, as agreements restraining sale of land to members of defined racial groups have long been held unenforceable in California because they contravened the State's statutory rule and public policy against restraints on alienation.  *Wayt* v. *Patee,* 205 Cal. 46, 269 P. 660; *Title Guarantee & Trust Co.* v. *Garrott,* 42 Cal. App. 152, 183 P. 470.

that arises is whether a court's awarding damages constitutes state action under the Fourteenth Amendment. To compel respondent to respond in damages would be for the State to punish her for her failure to perform her covenant to continue to discriminate against non-Caucasians in the use of her property. The result of that sanction by the State would be to encourage the use of restrictive covenants. To that extent, the State would act to put its sanction behind the covenants. If the State may thus punish respondent for her failure to carry out her covenant, she is coerced to continue to use her property in a discriminatory manner, which in essence is the purpose of the covenant. Thus, it becomes not respondent's voluntary choice but the State's choice that she observe her covenant or suffer damages. The action of a state court at law to sanction the validity of the restrictive covenant here involved would constitute state action as surely as it was state action to enforce such covenants in equity, as in *Shelley, supra.*

The next question to emerge is whether the state action in allowing damages deprives anyone of rights protected by the Constitution. If a state court awards damages for breach of a restrictive covenant, a prospective seller of restricted land will either refuse to sell to non-Caucasians or else will require non-Caucasians to pay a higher price to meet the damages which the seller may incur. Solely because of their race, non-Caucasians will be unable to purchase, own, and enjoy property on the same terms as Caucasians. Denial of this right by state action deprives such non-Caucasians, unidentified but identifiable, of equal protection of the laws in violation of the Fourteenth Amendment. See *Shelley, supra.*

But unlike *Shelley, supra,* no non-Caucasian is before the Court claiming to have been denied his constitutional rights. May respondent, whom petitioners seek to coerce by an action to pay damages for her failure to honor her

restrictive covenant, rely on the invasion of the rights of others in her defense to this action?

Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party. Reference to this rule is made in varied situations. See *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123, 149–154 (concurring opinion). The requirement of standing is often used to describe the constitutional limitation on the jurisdiction of this Court to "cases" and "controversies." See *Coleman* v. *Miller,* 307 U. S. 433, 464 (concurring opinion). Apart from the jurisdictional requirement, this Court has developed a complementary rule of self-restraint for its own governance (not always clearly distinguished from the constitutional limitation) which ordinarily precludes a person from challenging the constitutionality of state action by invoking the rights of others. See *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 346–348 (concurring opinion). The common thread underlying both requirements is that a person cannot challenge the constitutionality of a statute unless he shows that he himself is injured by its operation.[3] This principle has no application to the instant

---

[3] See *Frothingham* v. *Mellon,* 262 U. S. 447, 486–489 (federal taxpayer sought to challenge a federal statute in the enforcement of which federal revenues were applied); *Doremus* v. *Board of Education,* 342 U. S. 429, 434 (state taxpayer unable to show that there was "a measurable appropriation or disbursement of . . . funds occasioned solely by the [state] activities complained of"); *Tileston* v. *Ullman,* 318 U. S. 44 (doctor sought a declaratory judgment that a state statute would deprive certain of his *patients* of their lives without due process of law); *Tyler* v. *Judges of the Court of Registration,* 179 U. S. 405, 410 (landowner sought to challenge the notice provisions for a land registration proceeding in which he had not made himself a party, although he had notice of the proceedings, and even though "his interest in the land would remain unaffected" if the act were subsequently declared unconstitutional); *Gange Lumber Co.* v. *Rowley,* 326 U. S. 295; *Alabama Power Co.* v. *Ickes,* 302 U. S. 464,

case in which respondent has been sued for damages totaling $11,600, and in which a judgment against respondent would constitute a direct, pocketbook injury to her.

There are still other cases in which the Court has held that even though a party will suffer a direct substantial injury from application of a statute, he cannot challenge its constitutionality unless he can show that he is within the class whose constitutional rights are allegedly infringed. *Bode* v. *Barrett*, 344 U. S. 583, 585; *Jeffrey Mfg. Co.* v. *Blagg*, 235 U. S. 571, 576; *New York ex rel. Hatch* v. *Reardon*, 204 U. S. 152, 160–161; see also *Tennessee Elec. Power Co.* v. *Tennessee Valley Authority*, 306 U. S. 118, 144.[4] One reason for this ruling is that the state court, when actually faced with the question, might narrowly construe the statute to obliterate the objectionable feature, or it might declare the unconstitutional provisions separable. *New York ex rel. Hatch* v. *Reardon, supra,* at 160–161; *Wuchter* v. *Pizzutti*, 276 U. S. 13, 26–28 (dissenting opinion). It would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation. Nor are we so ready to frustrate the expressed will of Congress or that

---

478–480; cf. *McCabe* v. *Atchison, T. & S. F. R. Co.*, 235 U. S. 151, 162–164 (four Negroes who sought to enjoin enforcement of discriminatory state action denied relief on the ground that they failed to allege that they themselves had suffered, or were about to suffer, discriminatory treatment for which there was no adequate remedy at law). And compare *Doremus* v. *Board of Education, supra,* with *Illinois ex rel. McCollum* v. *Board of Education*, 333 U. S. 203, 206, 234.

[4] Cf. *Goldstein* v. *United States*, 316 U. S. 114; *Hale* v. *Henkel*, 201 U. S. 43, 69–70, and the lower court cases which restrict to the person whose premises were invaded the right to have illegally-seized evidence excluded. The rights in these cases are obviously closely linked to the person of the individual.

of the state legislatures. Cf. *Southern Pacific Co.* v. *Gallagher*, 306 U. S. 167, 172.

This is a salutary rule, the validity of which we reaffirm. But in the instant case, we are faced with a unique situation in which it is the action of the state *court* which might result in a denial of constitutional rights and in which it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court. Under the peculiar circumstances of this case, we believe the reasons which underlie our rule denying standing to raise another's rights, which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied by permitting the damages action to be maintained. Cf. *Quong Ham Wah Co.* v. *Industrial Acc. Comm'n*, 184 Cal. 26, 192 P. 1021.

In other unique situations which have arisen in the past, broad constitutional policy has led the Court to proceed without regard to its usual rule. In *Pierce* v. *Society of Sisters*, 268 U. S. 510, a state statute required all parents (with certain immaterial exceptions) to send their children to public schools. A private and a parochial school brought suit to enjoin enforcement of the act on the ground that it violated the constitutional rights of parents and guardians. No parent or guardian to whom the act applied was a party or before the Court. The Court held that the act was unconstitutional because it "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce* v. *Society of Sisters, supra*, at 534–535. In short, the schools were permitted to assert in defense of their property rights the constitutional rights of the parents and guardians. See also *Joint Anti-Fascist Refugee Comm.* v. *McGrath, supra*, at 141, 153–154; *Columbia Broadcasting System* v. *United States*, 316 U. S. 407, 422–423; *Helvering* v.

*Gerhardt,* 304 U. S. 405; *Truax* v. *Raich,* 239 U. S. 33; *United States* v. *Railroad Co.,* 17 Wall. 322; *Quong Ham Wah Co.* v. *Industrial Acc. Comm'n, supra;* cf. *United States* v. *Jeffers,* 342 U. S. 48, 52; *Federal Communications Comm'n* v. *Sanders Brothers Radio Station,* 309 U. S. 470; *Wuchter* v. *Pizzutti, supra.*

There is such a close relationship between the restrictive covenant here and the sanction of a state court which would punish respondent for not going forward with her covenant, and the purpose of the covenant itself, that relaxation of the rule is called for here. It sufficiently appears that mulcting in damages of respondent will be solely for the purpose of giving vitality to the restrictive covenant, that is to say, to punish respondent for not continuing to discriminate against non-Caucasians in the use of her property. This Court will not permit or require California to coerce respondent to respond in damages for failure to observe a restrictive covenant that this Court would deny California the right to enforce in equity, *Shelley, supra;* or that this Court would deny California the right to incorporate in a statute, *Buchanan* v. *Warley,* 245 U. S. 60; or that could not be enforced in a federal jurisdiction because such a covenant would be contrary to public policy:

> "It is not consistent with the public policy of the United States to permit federal courts in the Nation's capital to exercise general equitable powers to compel action denied the state courts where such state action has been held to be violative of the guaranty of the equal protection of the laws. We cannot presume that the public policy of the United States manifests a lesser concern for the protection of such basic rights against discriminatory action of federal courts than against such action taken by the courts of the States." *Hurd* v. *Hodge,* 334 U. S. 24, 35–36. See also *Roberts* v. *Curtis, supra.*

Consistency in the application of the rules of practice in this Court does not require us in this unique set of circumstances to put the State in such an equivocal position simply because the person against whom the injury is directed is not before the Court to speak for himself. The law will permit respondent to resist any effort to compel her to observe such a covenant, so widely condemned by the courts, since she is the one in whose charge and keeping reposes the power to continue to use her property to discriminate or to discontinue such use. The relation between the coercion exerted on respondent and her possible pecuniary loss thereby is so close to the purpose of the restrictive covenant, to violate the constitutional rights of those discriminated against, that respondent is the only effective adversary of the unworthy covenant in its last stand. She will be permitted to protect herself and, by so doing, close the gap to the use of this covenant, so universally condemned by the courts.

Petitioners argue that the right to equal protection of the laws is a "personal" right, guaranteed to the individual rather than to groups or classes. For instance, discriminatory denial of sleeping-car and dining-car facilities to an individual Negro cannot be justified on the ground that there is little demand for such facilities by Negroes as a group. *McCabe* v. *Atchison, T. & S. F. R. Co.,* 235 U. S. 151, 161–162. See *Sweatt* v. *Painter,* 339 U. S. 629, 635. This description of the right as "personal," when considered in the context in which it has been used, obviously has no bearing on the question of standing. Nor do we violate this principle by protecting the rights of persons not identified in this record. For instance, in the *Pierce* case, the persons whose rights were invoked were identified only as "present and prospective patrons" of the two schools. *Pierce* v. *Society of Sisters, supra,* at 535. In the present case, it is not non-Cauca-

sians as a group whose rights are asserted by respondent, but the rights of particular non-Caucasian would-be users of restricted land.

It is contended by petitioners that for California courts to refuse to enforce this covenant is to impair the obligation of their contracts. Article I, § 10, of the Federal Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." The short answer to this contention is that this provision, as its terms indicate, is directed against legislative action only.

> "It has been settled by a long line of decisions, that the provision of § 10, Article I, of the Federal Constitution, protecting the obligation of contracts against state action, is directed only against impairment by legislation and not by judgments of courts. . . ." *Tidal Oil Co.* v. *Flanagan,* 263 U. S. 444, 451.

It is finally contended that petitioners are denied due process and equal protection of the laws by the failure to enforce the covenant. The answer to that proposition is stated by the Court in *Shelley, supra,* in these words:

> "The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals. . . ." 334 U. S. 1, 22.

The judgment is

*Affirmed.*

Mr. Justice Reed and Mr. Justice Jackson took no part in the consideration or decision of this case.

Mr. Chief Justice Vinson, dissenting.

This case, we are told, is "unique." I agree with the characterization. The Court, by a unique species of

arguments, has developed a unique exception to an otherwise easily understood doctrine. While I may hope that the majority's use of "unique" is but another way of saying that the decision today will be relegated to its precise facts tomorrow, I must voice my dissent.

The majority seems to recognize, albeit ignores, a proposition which I thought was made plain in the *Shelley* case.[1] That proposition is this: these racial restrictive covenants, whatever we may think of them, are not legal nullities so far as any doctrine of federal law is concerned; it is not unlawful to make them; it is not unlawful to enforce them unless the method by which they are enforced in some way contravenes the Federal Constitution or a federal statute.

Thus, in the *Shelley* case, it was not the covenants which were struck down but judicial enforcement of them against Negro vendees. The question which we decided was simply whether a state court could decree the ouster of Negroes from property which they had purchased and which they were enjoying. We held that it could not. We held that such judicial action, which operated directly against the Negro petitioners and deprived them of their right to enjoy their property solely because of their race, was state action and constituted a denial of "equal protection." [2]

---

[1] *Shelley* v. *Kraemer*, 334 U. S. 1 (1948).

[2] The state action which we struck down was epitomized in this language, 334 U. S., at 19:

"We have no doubt that there has been state action in these cases in the full and complete sense of the phrase. The undisputed facts disclose that petitioners were willing purchasers of properties upon which they desired to establish homes. The owners of the properties were willing sellers; and contracts of sale were accordingly consummated. It is clear that but for the active intervention of the state courts, supported by the full panoply of state power, petitioners

This case is different.

The majority identifies no non-Caucasian who has been injured or could be injured if damages are assessed against respondent for breaching the promise which she willingly and voluntarily made to petitioners, a promise which neither the federal law nor the Constitution proscribes. Indeed, the non-Caucasian occupants of the property involved in this case will continue their occupancy undisturbed, regardless of the outcome of the suit. The state court was asked to do nothing which would impair their rights or their enjoyment of the property.

The plain, admitted fact that there is no identifiable non-Caucasian before this Court who will be denied any right to buy, occupy or otherwise enjoy the properties involved in this lawsuit, or any other particular properties, is decisive to me. It means that the constitutional defect, present in the *Shelley* case, is removed from this case. It means that this Court has no power to deal with the constitutional issue which respondent seeks to inject in this litigation as a defense to her breach of contract. It means that the covenant, valid on its face, can be enforced between the parties—unless California law or California policy forbids its enforcement—without running afoul of any doctrine ever promulgated by this Court, without any interference from this Court.

---

would have been free to occupy the properties in question without restraint.

"These are not cases, as has been suggested, in which the States have merely abstained from action, leaving private individuals free to impose such discriminations as they see fit. Rather, these are cases in which the States have made available to such individuals the full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell. . . ."

I turn, first, to the matter of our power to decide this case. The majority states the issue:

". . . May respondent, whom petitioners seek to coerce by an action to pay damages for her failure to honor her restrictive covenant, rely on the invasion of the rights of others in her defense to this action?"

Logically this issue should be met where such an issue is usually met—at the "threshold";[3] this decision should precede any discussion of the merits of respondent's constitutional claim. Yet it is not amiss to point out that the majority has failed to put first things first; it decides the merits and then, comforted by its decision on the merits, resolves its doubts that it has power to decide the merits.

A line of decisions—long enough to warrant the respect of even the most hardened skeptic of the strength of *stare decisis* as an effective limitation upon this Court's exercise of jurisdiction in constitutional cases—establishes the principle[4] which should stay this Court from deciding

---

[3] Compare *Montgomery Building & Construction Trades Council* v. *Ledbetter Erection Co.,* 344 U. S. 178, 179 (1952); *United Public Workers* v. *Mitchell,* 330 U. S. 75, 86 (1947).

[4] The principle derives, of course, from the nature of the judicial power conferred by Art. III of the Constitution. At a very early stage in this Court's history, Mr. Chief Justice Marshall put the matter thus:

". . . The article does not extend the judicial power to every violation of the constitution which may possibly take place, but to 'a case in law or equity,' in which a right, under such law, is asserted in a Court of justice. If the question cannot be brought into a Court, then there is no case in law or equity, and no jurisdiction is given by the words of the article. . . ." *Cohens* v. *Virginia,* 6 Wheat. 264, 405 (1821).

And see the discussion of this principle and its ramifications in Mr. Justice Brandeis' concurring opinion in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 341 (1936).

what it decides today—from doing what it does today—
from imposing a novel constitutional limitation upon the
power of the courts of the several states to enforce their
own contract laws as they choose. This deep-rooted,
vital doctrine demands that the Court refrain from de-
ciding a constitutional issue until it has a party before
it who has standing to raise the issue.[5] The majority
agrees that this is a "salutary" principle, and supplies us
with but a small sampling of the cases to show that it
has been rigorously applied in many varied situations,
and surely no sophistry is required to apply it to this
case. Accordingly, respondent must show, at the outset,
that she, herself, and not some unnamed person in an

---

[5] MR. JUSTICE FRANKFURTER, concurring in *Coleman* v. *Miller*, 307
U. S. 433, 460 (1939), sets forth the basis of the principle which I
believe the Court has failed to observe today:

"In endowing this Court with 'judicial Power' the Constitution
presupposed an historic content for that phrase and relied on assump-
tion by the judiciary of authority only over issues which are appro-
priate for disposition by judges. . . .

.        .        .        .        .

". . . It is our ultimate responsibility to determine who may invoke
our judgment and under what circumstances. . . . The scope and
consequences of our doctrine of judicial review over executive and
legislative action should make us observe fastidiously the bounds of
the litigious process within which we are confined. No matter how
seriously infringement of the Constitution may be called into question,
this is not the tribunal for its challenge except by those who have some
specialized interest of their own to vindicate, apart from a political
concern which belongs to all. *Stearns* v. *Wood*, 236 U. S. 75; *Fair-
child* v. *Hughes*, 258 U. S. 126.

.        .        .        .        .

"We can only adjudicate an issue as to which there is a claimant
before us who has a special, individualized stake in it. One who is
merely the self-constituted spokesman of a constitutional point of
view can not ask us to pass on it. . . ."

amorphous class, is the victim of the unconstitutional discrimination of which she complains.[6]

Respondent makes no such showing. She does not ask the Court to protect her own constitutional rights, nor even the rights of the persons who now occupy her property. Instead, she asks the Court to protect the rights of those non-Caucasians—whoever they may be—who might, at some point, be prospective vendees of some other property encumbered by some other similar covenant. Had respondent failed to designate herself as the agent of this anonymous, amorphous class, the majority certainly would have no power to vindicate its rights. Yet, because respondent happens to have decided to act as the self-appointed agent of these principals whom she cannot identify—in order to relieve herself of the obligations of her own covenant—the majority finds itself able to assert

---

[6] *Tyler* v. *Judges of the Court of Registration,* 179 U. S. 405 (1900), while not the first, is generally cited as the leading case on this aspect of the rules governing our exercise of jurisdiction. The Court said:

"The prime object of all litigation is to establish a right asserted by the plaintiff or to sustain a defence set up by the party pursued. Save in a few instances where, by statute or the settled practice of the courts, the plaintiff is permitted to sue for the benefit of another, he is bound to show an interest in the suit personal to himself, and even in a proceeding which he prosecutes for the benefit of the public, as, for example, in cases of nuisance, he must generally aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens." 179 U. S., at 406.

This historic view has been voiced again and again and applied in various situations down through the decades. See, *e. g., Lampasas* v. *Bell,* 180 U. S. 276 (1901); *Cronin* v. *Adams,* 192 U. S. 108 (1904); *The Winnebago,* 205 U. S. 354 (1907); *Rosenthal* v. *New York,* 226 U. S. 260 (1912); *McCabe* v. *Atchison, T. & S. F. R. Co.,* 235 U. S. 151 (1914); *Jeffrey Manufacturing Co.* v. *Blagg,* 235 U. S. 571 (1915); *Sprout* v. *City of South Bend,* 277 U. S. 163 (1928); *Tileston* v. *Ullman,* 318 U. S. 44 (1943); *Gange Lumber Co.* v. *Rowley,* 326 U. S. 295 (1945); *Bode* v. *Barrett,* 344 U. S. 583 (1953).

the power over state courts which it asserts today. I do not think that such tenuous circumstances can spawn the broad constitutional limitation upon state courts which springs from today's decision.[7]

Yet we are told that the rule which restricts our power to impose this constitutional limitation is but a rule of "self-restraint." So is every other jurisdictional limitation which depends, in the last analysis, solely upon this Court's willingness to govern its own exercise of power. And certainly to characterize the rule as self-imposed does not mean that it is self-removable by a simple self-serving process of argument. Yet the majority's logic, reduced to its barest outlines, seems to proceed in that fashion. We are told that the reasons for the self-imposed rule, which precludes us from reaching the merits, have been dissipated in this case, but the only reason why the reasons do not exist is because the Court first holds for respondent, and, having thus decided the merits, it feels free to abandon the rule which should preclude it from reaching the merits. In my view, respondent can-

---

[7] Similarly, I think that respondent's reliance, in her brief, on *Buchanan* v. *Warley*, 245 U. S. 60 (1917), as a precedent to show that she has met the minimum requirements on standing, is misplaced. In that case, a white vendor attacked a zoning ordinance which prohibited the sale of his property to any Negroes. The Court held he had standing to attack the ordinance since his constitutional attack was founded on the theory that the ordinance unconstitutionally abridged *his* right to sell his property to any willing purchaser, and not on the theory that it abridged the Negro vendee's right to buy property without being subject to discrimination by the state. The Court then held the statute invalid as an unreasonable classification.

Similarly, in *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), upon which the majority relies, a private school challenged a state law forbidding private education on the theory that the statute unreasonably abridged *its* (the school's) property rights. It was the assertion of the school's property rights which the Court considered in determining the validity of the statute.

not surmount the hurdle of our well-established rule by proceeding with an argument which carries her in a circle right back to her precise point of departure. If it should be, as the majority assumes, that there is no other way that the rights of unidentified non-Caucasians can be vindicated in court, that is only an admission that there is no way in which a substantial case or controversy can be predicated upon the right which the majority is so anxious to pass upon. I cannot assent to a manner of vindicating the constitutional rights of persons unknown which puts personal predisposition in a paramount position over well-established proscriptions on power.

But even if the merits are to be reached, even if we must decide whether enforcement of this covenant in a lawsuit of this kind is state action which contravenes the Fourteenth Amendment, I think that the absence of any direct injury to any identifiable non-Caucasian is decisive. The *Shelley* case, resting on the express determination that restrictive covenants are valid between the parties, dealt only with a state court's attempt to enforce them directly against innocent third parties whose right to enjoy their property would suffer immediate harm.

In this case, the plaintiffs have not sought such relief. The suit is directed against the very person whose solemn promise helped to bring the covenant into existence. The plaintiffs ask only that respondent do what she in turn had a right to ask of plaintiffs—indemnify plaintiffs for the bringing about of an event which she recognized would cause injury to the plaintiffs. We need not concern ourselves now with any question of whether this injury is fancied or real. The short of that matter is that the parties thought that any influx of non-Caucasian neighbors would impair their enjoyment of their properties, and, whether right or wrong, each had the right to control the use of his property against that event and to exact a promise from his or her neighbor that he or

she would act accordingly. And that is precisely what petitioners and respondent did. Moreover, we must, at this pleading stage of the case, accept it as a fact that respondent has thus far profited from the execution of this bargain; observance of the covenant by petitioners raised the value of respondent's properties. By this suit, the plaintiffs sought only to have respondent disgorge that which was gained at the expense of depreciation in her neighbors' property.

The majority speaks of this as an attempt to "coerce" respondent to continue to abide by her agreement. Yet the contract has already been breached. The non-Caucasians are in undisturbed occupancy. Furthermore, the respondent consented to the "coercion"—if "coercion" there be—by entering into the covenant. Plaintiffs ask only that respondent now pay what she legally obligated herself to pay for an injury which she recognized would occur if she did what she did.

Of course, there may be other elements of coercion. Coercion might result on the minds of some Caucasian property owners who have signed a covenant such as this, for they may now feel an economic compulsion to abide by their agreements. But visiting coercion upon the minds of some unidentified Caucasian property owners is not at all the state action which was condemned in the *Shelley* case. In that case, the state court had directed "the full coercive power of government" against the Negro petitioners—forcefully removing them from their property because they fell in a class discriminatorily defined. But in this case, where no identifiable third person can be directly injured if respondent is made to disgorge enough to indemnify petitioners, the Court should not undertake to hold that the Fourteenth Amendment stands as a bar to the state court's enforcement of its contract law.

Obviously we can only interfere in this case if the Fourteenth Amendment compels us to do so, for that is the only basis upon which respondent seeks to sustain her defense. While we are limited to enforcement of the Fourteenth Amendment, the state courts are not; they may decline to recognize the covenants for other reasons. Since we must rest our decision on the Constitution alone, we must set aside predilections on social policy and adhere to the settled rules which restrict the exercise of our power of judicial review—remembering that the only restraint upon this power is our own sense of self-restraint.[8]

Because I cannot see how respondent can avail herself of the Fourteenth Amendment rights of total strangers—the only rights which she has chosen to assert—and since I cannot see how the Court can find that those rights would be impaired in this particular case by requiring respondent to pay petitioners for the injury which she recognizes that she has brought upon them, I am unwilling to join the Court in today's decision.

---

[8] See Mr. Justice Stone dissenting in *United States* v. *Butler*, 297 U. S. 1, 78–79 (1936).