The **SPRINGFIELD BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., Plaintiffs,**

v.

The **CITY OF SPRINGFIELD, ILLINOIS, et al., Defendants.**

No. 00–3136–CV.

United States District Court, C.D. Illinois, Springfield Division.

April 18, 2001.

David L. Rose, Washington, DC, Ralph E. Williams, Schuering & Kerley, PC, Springfield, IL, for Plaintiffs.

Robert M. Rogers, Office of Corporation Counsel, Bradley B. Wilson, Gates, Wise & Schlosser, PC, Donald M. Craven, Craven & Thornton, Springfield, IL, for Defendants.

## *OPINION*

RICHARD MILLS, District Judge:

This cause is before the Court on the NAACP's Motion For Preliminary Injunction to Prevent Hiring From the 1999 White Male List of Firefighters by the City of Springfield.

## FACTS

On May 16, 2000, the NAACP filed suit against the City of Springfield ("the City") and other Defendants for alleged racial discrimination under 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. §§ 1981 and 1981a. Among other things, the NAACP complained that the test the City used to fill vacancies in its police and fire departments had a disparate impact on blacks. The NAACP also contended that the police and fire departments' physical abilities test disproportionately screened out female applicants. It moved for a preliminary injunction on June 7, 2000, but withdrew its motion on July 10, 2000. The same day it withdrew its motion, the NAACP filed an Amended Complaint. Like the original complaint, the Amended Complaint also asked for injunctive relief. The NAACP did not, however, request a preliminary injunction hearing pursuant to Fed. R.Civ.P. 65.

The issue of injunctive relief remained dormant until April 5, 2001. It was on this date that the NAACP moved for a preliminary injunction hearing. A week later the NAACP asked the Court to set the matter for argument. The Court heard argument on Monday, April 16, 2001. Various NAACP executives were present along with their counsel. The City of Springfield[1] was represented by counsel and Springfield Fire Department Chief Frank Edwards.

According to the parties, 553 people took the written portion of the Springfield Fire Department's 1999 test. The test was used to assess candidates' abilities in three areas: reading comprehension, math and listening comprehension. Forty-one of the

---

1. The Springfield Police Department and its representatives were not present at the hearing. It appears that the police department and the NAACP have been able to successfully negotiate changes to the department's candi-

date selection process. The Court applauds these efforts as it believes that difficult issues like these are most satisfactorily resolved by the parties rather than resort to the courts.

test-takers were black, including NAACP members James Eubanks and Tony Little. Eubanks and Little were among the thirty-nine black test-takers who failed the written exam. Of the 512 whites who took the test, 123 received passing scores. The NAACP alleges that these numbers establish a prima facie disparate impact claim under Title VII. It argues that it has a substantial likelihood of proving this at trial. It also argues that its members will be irreparably harmed if the City is allowed to hire white firefighters based on the 1999 test results. The NAACP's principal argument in this regard is that its members will not be able to make up "on-the-job experience" lost while this matter waits for trial in September 2001. Thus, the NAACP moves the Court to issue a preliminary injunction which prevents the City from hiring firefighters based on the 1999 firefighter test results. Hiring is scheduled to take place on April 30, 2001.

## ANALYSIS

### 1. Standing

■ Ordinarily, one does not have standing to pursue the constitutional rights of a third party. *See Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). However,

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

■ Here, the City argues that the NAACP lacks standing to bring suit on behalf of the female plaintiffs because the female plaintiffs were not NAACP members at the time suit was filed. During the preliminary injunction hearing, the NAACP conceded that the female plaintiffs were not NAACP members. As such, the NAACP lacks standing to represent the female plaintiffs. *See Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441.

On the other hand, the NAACP clearly has standing as to the black plaintiffs since all three of the *Hunt* factors are satisfied. First, black plaintiffs James Eubanks and Tony Little were NAACP members at the time suit was filed. Second, the NAACP is interested in making sure that these applicants were not subject to racially discriminatory testing, a goal consistent with the NAACP's general commitment to eradicating racial discrimination. Third, neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. Thus, the NAACP has standing with respect to the black plaintiffs.

### 2. Preliminary Injunction

■ Preliminary injunctions exist "merely to preserve the relative positions of the parties until a trial on the merits can be held." *See University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Their purpose is limited and the proof that must be offered to support them is limited as well. Thus, a party is not required to fully prove its claim at the preliminary injunction hearing. *See Id.* By the same token, a preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *See Mazurek v. Armstrong*, 520

U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (per curiam) (citation omitted).

■■■ A court may grant a preliminary injunction under Fed.R.Civ.P. 65 if the moving party has demonstrated some likelihood of succeeding on the merits [2] and an inadequate remedy at law if relief is not granted. *See Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1291 (7th Cir.1996). If the court finds either factor is not present, its analysis ends and the preliminary injunction should not be issued. *See Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1998), citing *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992).

If the movant demonstrates both factors, the court must then consider "the irreparable harm that the nonmovant will suffer if the preliminary relief is granted, balanced against the harm to the movant." *See Grossbaum*, 100 F.3d at 1291. Finally, the court must "weigh the public interest by considering the effect of granting or denying relief on parties." *See Id.*[3]

### A. Likelihood of Succeeding on the Merits

■■■ To state a prima facie Title VII disparate impact claim, the NAACP must show that the Defendants' facially neutral employment test resulted in a significantly discriminatory hiring pattern. *See Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). The burden then shifts to the City to demonstrate that the test is "job related for the position in question and consistent with business necessity." *See Id.* at 658, 109 S.Ct. 2115. If the City can show this, the NAACP has the burden of establishing the existence of an equally valid alternative selection device with less adverse impact and the City's refusal to use it. *See Id.* at 660–61, 109 S.Ct. 2115.

### 1) Disparate Impact

■■■ A comparison between "the racial composition of those qualified persons in the relevant labor market and those in the jobs at issue typically forms the proper basis for the initial inquiry in a disparate impact case." *See Id.* 490 U.S. at 658, 109 S.Ct. at 2125. The Springfield Fire Department last administered the written portion of its employment test in 1999. Five hundred and fifty-three people took the written test. Of the forty-one testtakers who were black, two (or about 5%) received a passing score. Five hundred and twelve whites took the test and 123 (or about 24%) passed. Since the pass rate of black testtakers is less than 80% of what it is for whites, these numbers establish a prima facie case of adverse impact. *See* 29 C.F.R. § 1607.4(D)(1978).

### 2) Job Relatedness

■■■ An employer may establish that its selection process is job related with a validity study. *See* 29 C.F.R. § 1607.5(A) ("users may rely upon criterion-related validity studies, content validity studies or

---

**2.** For purposes of a preliminary injunction, "likelihood of success on the merits" exists if the movant shows a "better than negligible chance of succeeding on the merits." *See Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997).

**3.** As opposed to the four-factor test just described, a highly similar five factor preliminary injunction test has been stated which requires a moving party to establish that 1)

there is a reasonable likelihood of success on the merits; 2) there exists no adequate remedy at law; 3) it will suffer irreparable harm without the injunction; 4) the threatened harm to the movant outweighs the injury an injunction may cause to the nonmovant; and 5) the injunction will not disserve the public interest. *See Kiel v. City of Kenosha*, 236 F.3d 814, 815–16 (7th Cir.2000). Regardless of which test is used, the outcome here is the same.

construct validity studies"); *see also Billish v. City of Chicago*, 989 F.2d 890, 896 (7th Cir.1993) (en banc) (stating that no method is preferred). Evidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated. *See* 29 C.F.R. § 1607.5(B). In order to satisfy this requirement, an employer need not "test all or nearly all of the skills required for the occupation." *See Gillespie v. State of Wisconsin*, 771 F.2d 1035, 1044 (7th Cir.1985). Instead, "an employment test must neither: (1) focus exclusively on a minor aspect of the position; nor (2) fail to test a significant skill required by the position." *See Id.* at 1044.

In the instant case, the City used an employment test constructed by a consulting firm which designs "basic skills examinations for the purpose of assisting with the selection of entry-level firefighters." *See* Def.'s Ex. 2 (Letter from Steven J. Standard, Ph.D., of Stanard & Associates). The consultant developed the test after conducting "an indepth study of important work behaviors for successful job performance" by firefighters. *See Id.* The test is purportedly in keeping with the Uniform Guidelines on Employee Selection Procedures and it measures skills in reading comprehension, math and listening comprehension. *See* Def.'s Ex. 2. The report that accompanies the test indicates that these skills are essential to a firefighter's ability to understand training materials and important warnings (*i.e.* hazardous materials), make basic calculations about water pressure and hose length relative to fire distance, and to digest reported information such as directions about what to do after arriving at the scene of a fire. *See Id.*

The NAACP attacks this test because the "nationwide" job analysis that the City's consulting firm used to validate it was limited to a nonrandom sampling of "twelve small-to-medium sized" cities which found that reading, math and listening skills were important for entry-level firefighters. The deposition of the NAACP's expert states that the validation is further flawed because it "did not investigate the extent to which these skills were developed *before versus after* hiring, or provide operational definitions of these skills."

While the Court gives considerable deference to expert opinions, it appears as though these criticisms are a bit off the mark. First, the "twelve small-to-medium sized" cities to which the NAACP's expert refers [4] vary in size from 8,000 people to nearly 500,000 people. Springfield, a city of some 100,000 plus people, fits comfortably within the population range of these cities. Thus, it appears that Springfield and its fire department can be reasonably compared to these cities and their fire departments. Second, while the City's test may not have investigated the extent to which skills were "developed *before versus after* hiring, or provide operational definitions of these skills", this criticism does not undermine the City's assertion that reading, math and listening comprehension are necessary skills for firefighters. Thus, the NAACP fails to show that the written portion of the Cit's test was

---

4. The twelve cities and their approximate populations are: Argonne, IL (pop.unknown); Carol Stream, IL (pop.37,000); Glenside, IL (pop.unknown); Lombard, IL (pop.42,000); Warrenville, IL (pop.12,000); Wood Dale, IL (pop.13,000); Itasca, IL (pop.8,000); Bensen-ville, IL (pop.18,000); Bloomingdale, IL (pop.19,000); Lisle/Woodridge, IL (pop.20,000/29,000); Denver, CO (pop.498,000); and Aurora, CO (pop.252,000). *See Nat'l Geographic Road Atlas (United States, Canada and Mexico)*, (1999) (deluxe ed.).

unrepresentative of an entry-level firefighter's job responsibilities.

### 3) Alternative Testing Procedure

■ Since the City has established the test's job relatedness for purposes of this motion, the burden shifts to the NAACP to demonstrate that an equally valid selection device with less adverse impact exists and that the City refused to use it. The NAACP tries to satisfy this burden by urging the City to use the same selection test employed by the Springfield *Police* Department. This might be feasible if the two departments required and tested for the same essential skills. However, there is no indication that this is the case. Whereas a firefighter may have to have basic math skills in order to compute water pressure, hose length, etc., a police officer may not require such skills. Accordingly, use of the police department's test may not test for skills which are crucial to firefighters. The NAACP cannot reasonably assert that use of the police department's test is a reasonable alternative testing procedure. The NAACP's failure to propose a reasonable alternative prevents it from establishing some likelihood of success on the merits. *See Adams*, 135 F.3d at 1154.

### B. Inadequate Remedy at Law

■ District courts can in most public employment disputes fashion an appropriate legal remedy. This was recently stated in *Adams v. City of Chicago*, 135 F.3d 1150 (7th Cir.1998). In *Adams*, minority police officers brought a Title VII action against the City of Chicago which alleged that the test the City used to determine promotions was racially biased. *See Id.* at 1152–53. The officers sought a preliminary injunction to keep the City from using the test during the pendency of their claim. The district court refused to issue a preliminary injunction because the officers failed to establish some likelihood of success on the merits and could not establish irreparable injury. *See Id.* at 1154. The Seventh Circuit affirmed the district court's decision on the basis of the officers' failure to show irreparable injury. The Court acknowledged that the officers could be made whole via retroactive promotions, back pay, pension benefits and full seniority rights. *See Id.*, citing *Lasco v. Northern*, 733 F.2d 477, 481 (7th Cir.1984) ("In the context of public employment, the loss of wages, employee benefits, and opportunities for promotion during a period of suspension do not constitute irreparable injury and do not warrant the granting of a preliminary injunction").

The NAACP recognizes that these remedies exist, but it argues that they are insufficient here. In essence, the NAACP contends that the loss of experience that the black plaintiffs will suffer while the litigation proceeds cannot be compensated. The NAACP bases its argument on *Carson v. American Brands, Inc.*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). In *Carson*, a group of former black employees and job applicants attempted to enter into a consent decree with an employer and various unions that would permanently enjoin the employer and unions from discriminating against black employees. *See* 450 U.S. at 79, 101 S.Ct. at 994. A Virginia district court refused to enter the proposed consent decree after it held that there was no showing of past discrimination. The former employees and job applicants appealed, but the Fourth Circuit dismissed for want of jurisdiction. *See Id.* The group then appealed the jurisdictional issue. The Supreme Court held that the district court's order refusing to enter the consent decree was appealable. The Court stated that the district court's refusal to enter the decree *might* cause the group irreparable harm by denying them specific job opportunities, training and the competitive advantages that come with those opportunities. *See* 450 U.S. at 89, n.

16, 101 S.Ct. at 999, n. 16 (emphasis added).

■ Subsequent to *Carson*, the Seventh Circuit held that delay does not constitute irreparable injury. *See Cox v. City of Chicago*, 868 F.2d 217, 223 (7th Cir. 1989) ("some delay in promotion does not constitute irreparable injury"). Because job opportunities, etc., can only be gained while employed, it is implicit from the Seventh Circuit's position that lost opportunities and competitive advantages cannot constitute irreparable injury. The NAACP's reliance on *Carson* is, therefore, misplaced. Moreover, this case is set to go to trial in five months. If the NAACP successfully challenges the fire department's test in court, the black plaintiffs have lost only a short amount of time on the job. The City argued at the preliminary injunction hearing that firefighting experience does not have a linear correlation with hours worked and that experience is gained fastest by being assigned to the most frequently called upon stationhouses. This argument by the City was uncontested. Thus, it appears that black plaintiffs could "catch up" in total experience *vis-a-vis* more senior counterparts by getting assigned to a busy stationhouse. Like other remedies, it would be within the Court's power to order that black firefighters be given the option of receiving such assignments. Accordingly, the Court finds that the NAACP's "lost experience" argument is without merit.

### C. Balancing of Harms

■ It is unnecessary to analyze any other factors if a plaintiff cannot establish either "likelihood of success" or "irreparable harm". *See Adams*, 135 F.3d at 1154; *Abbott Lab.*, 971 F.2d at 11. Still, the Court will take up the "balancing of harms" and "public interest" analysis because they too support denying a preliminary injunction here.

The Springfield Fire Department and the Springfield Office of Budget and Management project that there will be ten to twelve vacancies at the fire department within the next year. *See* Edwards Aff. ¶¶ 12–13, Edwards Dep. pp. 17–24. The City argues that it needs to hire ten new firefighters now in order to train them and have them ready to fill these vacancies. The City also argues that it must have these individuals in order to maintain the minimum number of firefighters required per shift. Without these ten new firefighters, the fire department will have to use overtime/hireback pay incentives to ensure that it has the necessary number of firefighters per shift. Using overtime puts tired firefighters back on the job, increasing the risk of injury to them and those with whom they work. Furthermore, the rate of pay for overtime/hireback is one and a half times the regular rate of pay. According to the City's calculations, this will cost the City of Springfield an additional $529,240.00 in overtime expenses. *See* Edwards Aff. at ¶¶ 15–18. In order to come up with this money, the fire department would have to lay off personnel or forego the purchase of much needed equipment, such as an aerial truck. *See* Edwards Aff. ¶ 22; Edwards Dep. pp. 105–06; Zolhadr Dep. pp. 45–55. The NAACP argues that the City has overstated its vacancy and cost projections and exaggerated the possibility of firefighters' fatigue.

The Court cannot determine from the evidence which party is correct as to vacancies and costs. With regard to fatigue, however, the Court must defer to the Chief of the Springfield Fire Department. In his deposition, Chief Edwards states that he has observed increased injuries to firefighters during overtime situations and he attributes this to fatigue. Instead of offering a comparable source to rebut this argument, the NAACP's attorney merely

speculates that firefighters do not really get fatigued because they spend most of their time "relaxing" in stationhouses. Although the NAACP's counsel is a talented and able attorney, a fire department chief is far more authoritative on this issue. Thus, the Court cannot put too little emphasis on the threat to life and property posed through the use of weary firefighters. Regardless of any other factor, this alone tips the balance of harms in the City's favor.

### D. Public Interest

As important as it is to make sure that employers do not use discriminatory testing procedures, it is paramount that the public can depend on life-saving services like firefighting. Inadequate fire protection poses an enormous risk to life and property for all, regardless of color or gender. In the face of such risk, the hiring of needed firefighters cannot be delayed. Thus, the public interest clearly supports a denial of the requested injunction.

*Ergo,* Plaintiff's Motion For Preliminary Injunction to Prevent Hiring From the 1999 White Male List of Firefighters is DENIED.