Justice GORSUCH, dissenting.
The judicial power is constrained by an array of rules. Rules about the deference due the legislative process, the standing of the parties before us, the use of facial challenges to invalidate democratically enacted statutes, and the award of prospective relief. Still more rules seek to ensure that any legal tests judges may devise are capable of neutral and principled administration. Individually, these rules may seem prosaic. But, collectively, they help keep us in our constitutionally assigned lane, sure that we are in the business of saying what the law is, not what we wish it to be.
Today's decision doesn't just overlook one of these rules. It overlooks one after another. And it does so in a case touching on one of the most controversial topics in contemporary politics and law, exactly the context where this Court should be leaning most heavily on the rules of the judicial process. In truth, Roe v. Wade , 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), is not even at issue here. The real question we face concerns our willingness to follow the traditional constraints of the judicial process when a case touching on abortion enters the courtroom.
*
When confronting a constitutional challenge to a law, this Court ordinarily reviews the legislature's factual findings under a "deferential" if not "[u]ncritical" standard. Gonzales v. Carhart , 550 U.S. 124, 165-166, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007). When facing such a challenge, too, this Court usually accepts that "the public interest has been declared in terms well-nigh conclusive" by the legislature's adoption of the law-so we may review the law only for its constitutionality, not its wisdom. Berman v. Parker , 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954). Today, however, the plurality declares that the law before us holds no benefits for the public and bears too many social costs. All while sharing virtually nothing about the *2172 facts that led the legislature to conclude otherwise. The law might as well have fallen from the sky.
Of course, that's hardly the case. In Act 620, Louisiana's legislature found that requiring abortion providers to hold admitting privileges at a hospital within 30 miles of the clinic where they perform abortions would serve the public interest by protecting women's health and safety. Those in today's majority never bother to say so, but it turns out that Act 620's admitting privileges requirement for abortion providers tracks longstanding state laws governing physicians who perform relatively low-risk procedures like colonoscopies, Lasik eye surgeries, and steroid injections at ambulatory surgical centers. In fact, the Louisiana legislature passed Act 620 only after extensive hearings at which experts detailed how the Act would promote safer abortion treatment-by providing "a more thorough evaluation mechanism of physician competency," promoting "continuity of care" following abortion, enhancing inter-physician communication, and preventing patient abandonment.
Testifying physicians explained, for example, that abortions carry inherent risks including uterine perforation, hemorrhage, cervical laceration, infection, retained fetal body parts, and missed ectopic pregnancy. Unsurprisingly, those risks are minimized when the physician providing the abortion is competent. Yet, unlike hospitals which undertake rigorous credentialing processes, Louisiana's abortion clinics historically have done little to ensure provider competence. Clinics have failed to perform background checks or to inquire into the training of doctors they brought on board. Clinics have even hired physicians whose specialties were unrelated to abortion-including a radiologist and an ophthalmologist. Requiring hospital admitting privileges, witnesses testified, would help ensure that clinics hire competent professionals and provide a mechanism for ongoing peer review of physician proficiency. Loss of admitting privileges, as well, might signal a problem meriting further investigation by state officials. At least one Louisiana abortion provider's loss of admitting privileges following a patient's death alerted the state licensing board to questions about his competence, and ultimately resulted in restrictions on his practice.
The legislature also heard testimony that Louisiana's clinics and the physicians who work in them have racked up dozens of citations for safety and ethical violations in recent years. Violations have included failing to use sterile equipment, maintaining unsanitary conditions, failing to monitor patients' vital signs, permitting improper administration of medications by unauthorized persons, and neglecting to obtain informed consent from patients. Some clinics have failed to maintain supplies of emergency medications and medical equipment for treating surgical complications. One clinic used single-use hoses and tubes on multiple patients, and the solution needed to sterilize instruments was changed so infrequently that it often had pieces of tissue floating in it. Hospital credentialing processes, witnesses suggested, could help prevent such violations. In the course of the credentialing process, physicians' prior safety lapses, including criminal violations and medical malpractice suits, would be revealed and investigated, and incompetent doctors might be weeded out.
The legislature heard, too, from affected women and emergency room physicians about clinic doctors' record of abandoning their patients. One woman testified that, while she was hemorrhaging, her abortion provider told her, " 'You're on your own. Get out.' " Eventually, the woman went to *2173 a hospital where an emergency room physician removed fetal body parts that the abortion provider had left in her body. Another patient who complained of severe pain following her abortion was told simply to go home and lie down. When she decided for herself to go to the emergency room, physicians discovered a tear in her uterus and a large hematoma containing a fetal head. The woman required an emergency hysterectomy. In another case, a clinic physician allowed a patient to bleed for three hours, yet a clinic employee testified that the physician would not let her call 911 because of possible media involvement. In the end, the employee called anyway and emergency room personnel discovered that the woman had a perforated uterus and a needed a hysterectomy. A different physician explained that she routinely treats abortion complications in the emergency room when the physician who performed the abortion lacks admitting privileges. In her experience, that situation "puts a woman's health at an unnecessary, unacceptable risk that results from a delay of care ... and a lack of continuity of care." Admitting privileges would mitigate these risks, she testified, because "the physician who performed the procedure would be the one best equipped to evaluate and treat the patient."
Nor did the legislature neglect to consider the law's potential burdens. As witnesses explained, the admitting privileges requirement in Act 620 for abortion clinic providers would parallel existing requirements for many physicians who work at ambulatory surgical centers. And there is no indication this parallel admitting privileges requirement has led to the closing of any surgical centers or otherwise presented obstacles to quality care in Louisiana. Further, legislators learned that at least one Louisiana abortion provider already had qualifying admitting privileges, suggesting other competent abortion providers would be able to comply with the new regulation as well.
Since trial, the State continues to accrue evidence supporting Act 620, and the State has sought to lodge that evidence with this Court. In particular, the State has learned of additional safety violations at Louisiana clinics, including evidence of an abortion provider deviating from the standard of care in a way that can result in the live births of nonviable fetuses. The State has also proffered new evidence of potential criminal conduct by Louisiana abortion providers, including the failure to report the forcible rape of a minor and performing an abortion on a minor without parental consent or judicial bypass.
*
After overlooking so many facts and the deference owed to the legislative process, today's decision misapplies many of the rules that normally constrain the judicial process. Start with the question who can sue. To establish standing in federal court, a plaintiff typically must assert an injury to her own legally protected interests-not the rights of someone else. Warth v. Seldin , 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This rule ensures that the judiciary stays focused on the "factual situation before it," New York v. Ferber , 458 U.S. 747, 768, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), while "questions of wide public significance" remain with "governmental institutions ... more competent to address" them, Warth , 422 U.S. at 500, 95 S.Ct. 2197.
No one even attempts to suggest this usual prerequisite is satisfied here. The plaintiffs before us are abortion providers. They do not claim a constitutional right to perform that procedure, and no one on the Court contends they hold such a right. Instead, the abortion providers before us seek only to assert the constitutional *2174 rights of an undefined, unnamed, indeed unknown, group of women who they hope will be their patients in the future.
In narrow circumstances, to be sure, this Court has allowed cases to proceed based on "third-party standing." But to qualify, the plaintiff must demonstrate both that he has a " 'close' relationship" with the person whose rights he wishes to assert and that some " 'hindrance' " hampers the right-holder's "ability to protect his own interests." Kowalski v. Tesmer , 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). Think of parents and children, guardians and wards. In these special cases, the logic goes, the plaintiff's interests are so aligned with those of a particular right-holder that the litigation will proceed in much the same way as if the right-holder herself were present.
Nothing like that exists here. In the first place, the plaintiff abortion providers identify no reason to think affected women are unable to assert their own rights if they wish. Instead, the plaintiffs merely gesture to a 1976 plurality opinion suggesting that women seeking abortions "generally" face a hindrance in asserting their own rights. Singleton v. Wulff , 428 U.S. 106, 118, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). But whatever the supposition of a 1976 plurality, in the years since interested women have challenged abortion regulations on their own behalf in case after case. See, e.g. , McCormack v. Herzog , 788 F.3d 1017 (CA9 2015) ; Jane L. v. Bangerter , 102 F.3d 1112 (CA10 1996) ; Margaret S. v. Edwards , 794 F.2d 994 (CA5 1986) ; see also Whole Woman's Health v. Hellerstedt , 579 U. S. ----, ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016) (THOMAS, J., dissenting) (slip op., at 4) (collecting additional examples). And no one suggests this suit differs from those cases in any meaningful way. The truth is transparent: The plaintiffs hardly try to carry their burden of showing a hindrance because they can't.
Separately and additionally, the abortion providers cannot claim a "close relationship" with the women whose rights they assert. Normally, the fact that the plaintiffs do not even know who those women are would be enough to preclude third-party standing. This Court has held, for example, that a future "hypothetical attorney-client relationship" (as opposed to an "existing " one) cannot confer third-party standing. Kowalski , 543 U.S. at 131, 125 S.Ct. 564. Likewise, this Court has held that a pediatrician lacks standing to defend a State's abortion laws on the theory that fetuses are his future potential patients. Diamond v. Charles , 476 U.S. 54, 66, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). If standing isn't present in cases like those, it is hard to see how it might be present in this one.
Nor is that the end of the plaintiffs' standing problems. Even when a plaintiff can identify an actual and close relationship, this Court will normally refuse third-party standing if the plaintiff has a potential conflict of interest with the person whose rights are at issue. See Elk Grove Unified School Dist. v. Newdow , 542 U.S. 1, 15, 17-18, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). And it's pretty hard to ignore the potential for conflict here. After all, Louisiana's law expressly aims to protect women from the unsafe conditions maintained by at least some abortion providers who, like the plaintiffs, are either unwilling or unable to obtain admitting privileges. Cf. ante, at 2166 - 2167 (ALITO, J., dissenting).
Seeking to set all these difficulties aside, today's decision contends that Louisiana has waived its prudential standing arguments. But in doing so, today's decision mistakes three more legal principles. First, what the plurality characterizes as a waiver *2175 arises from the State's admission that applicable circuit law allowed the plaintiffs standing. At worst, that reflects a forfeiture of, or a failure to pursue, a possible argument against standing, not an affirmative waiver of the argument, or an intentional relinquishment of any interest in the issue. Cf. ante, at 2165 - 2166 (ALITO, J., dissenting). Second, this Court typically relies on a forfeiture or even a waiver only if the issue was " 'not pressed or passed upon' " in the lower courts. United States v. Williams , 504 U.S. 36, 41, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). That rule's disjunctive phrasing is no accident-it "permit[s] review of an issue not pressed so long as it has been passed upon" below. Ibid. Here, the Fifth Circuit did pass upon the standing question-so forfeiture or waiver presents no impediment to our review. See June Medical Services, L.L.C. v. Gee , 814 F.3d 319, 322-323 (2016). Finally, this Court has held that even truly forfeited or waived arguments may be entertained when structural concerns or third-party rights are at issue. Freytag v. Commissioner , 501 U.S. 868, 878-880, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). Both conditions are present here.
*
Next consider our rules about facial challenges. Generally, courts decide the constitutionality of statutes as applied to specific people in specific situations and disfavor facial challenges seeking to forestall a law's application in every circumstance. The reasons for this rule are many. Not least, when a court focuses on the parties before it, it is able to assess the law's application within a real factual context, rather than left to imagine "every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." Barrows v. Jackson , 346 U.S. 249, 256, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Importantly, too, as-applied challenges reduce the risk that a court will "short circuit the democratic process" by interfering with legislation any more than necessary to remedy a complaining party's injury. Washington State Grange v. Washington State Republican Party , 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008).
As a result, the path for a litigant pursuing a facial challenge is deliberately difficult. Typically, a plaintiff seeking to render a law unenforceable in all of its applications must show that the law cannot be constitutionally applied against anyone in any situation. United States v. Stevens , 559 U.S. 460, 472-473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). This Court has carved out an exception to this high bar for overbreadth challenges under the First Amendment. Some suggest this exception is ill-advised. United States v. Sineneng-Smith , 590 U. S. ----, ---- - ----, 140 S.Ct. 1575, --- L.Ed.2d ---- (2020) (THOMAS, J., concurring) (slip op., at 5-6). But even in First Amendment overbreadth challenges, a plaintiff still must show that the law in question has " 'a substantial number of ... applications [ that] are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " Stevens , 559 U.S. at 473, 130 S.Ct. 1577 (quoting Washington State Grange , 552 U.S. at 449, n. 6, 128 S.Ct. 1184 ); see also Stevens , 559 U.S. at 481-482, 130 S.Ct. 1577 (holding law unconstitutional under First Amendment where "impermissible applications ... far outnumber[ed] any permissible ones").
Today, it seems any of these standards would demand too much. Instead of asking whether the law has a "substantial number of unconstitutional applications" compared to its "legitimate sweep," the plurality asks whether the law will impose a " 'substantial obstacle' " for a " 'large fraction' " of " 'those women for whom the provision is *2176 an actual rather than an irrelevant restriction.' " Ante, at 2132. Concededly, the two tests sound similar-after all, who could say whether a "substantial number" is more or less than a "large fraction"? But notice the switch at the end, where the plurality limits our focus to women for whom the law is an "actual" restriction. Because of that limitation, it doesn't matter how many women continue to have convenient access to abortions: Any woman not burdened by the challenged law is deemed "irrelevant" to the analysis. So instead of asking how the law's unconstitutional applications compare to its legitimate sweep, the plurality winds up asking only whether the law burdens a very large fraction of the people that it burdens. The words might sound familiar, but this circular test is unlike anything we apply to facial challenges anywhere else.
Abandoning our usual caution with facial challenges leads, predictably, to overbroad conclusions. Suppose that for a substantial number of women Louisiana's law imposes no burden at all. These women might live in an area well-served by well-qualified abortion providers who can easily obtain admitting privileges. No one could dispute the law is constitutional as applied to these women and providers. But suppose the law makes it difficult to obtain an abortion on the other side of the State, where qualified providers are fewer and farther between. Under the standard applied today, it seems the entire law would fall statewide, notwithstanding its undeniable constitutionality in many applications.
Nor is this possibility farfetched. Today's decision declares the admitting privileges requirement unconstitutional even as applied to Does 3 and 5, each of whom holds admitting privileges. Not a single woman would be burdened by requiring these doctors to maintain the privileges they already have. Yet the State may not enforce the law even against them. In effect, the standard for facial challenges has been flipped on its head: Rather than requiring that a law be unconstitutional in all its applications to fall, today's decision requires that Louisiana's law be constitutional in all its applications to stand.
*
Even when it comes to assessing the law's effects on the subset of women deemed "relevant," this case proves unusual. Normally, to obtain a prospective injunction like the one approved today, a plaintiff must show that irreparable injury is not just possible, but likely. O'Shea v. Littleton , 414 U.S. 488, 501-502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ; Winter v. Natural Resources Defense Council, Inc. , 555 U. S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Yet, nothing like that standard can be found at work today.
The plaintiffs allege that statewide enforcement of Act 620 would irreparably injure Louisiana women by making it difficult for them to obtain abortions. To justify injunctive relief on that theory, however, it can't be enough to show that the law would induce any particular doctor or clinic to stop providing abortions. Instead, the plaintiffs would have to show that a sufficient number of clinics would close (without enough new clinics opening) so that supply would no longer meet demand for abortion in the State. And when assessing claims like that , we usually proceed with caution, aware of the "the difficulties and uncertainties involved in determining how [a] relevant market" would behave in response to changed circumstances. Illinois Brick Co. v. Illinois , 431 U.S. 720, 743, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). At a minimum, we expect one change in a marketplace-such as the introduction of a new regulation-will induce other responsive changes.
*2177 General Motors Corp. v. Tracy , 519 U.S. 278, 307-309, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997). When "the claim is one that simply makes no economic sense," too, the plaintiffs "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Matsushita Elec. Industrial Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
Rather than follow these rules, today's decision proceeds to accept one speculative proposition after another to arrive at what can only be called a worst case scenario. Take the question whether existing providers will be able to continue their existing practices. On its way to predicting dire results, the plurality uncritically accepts that, if Act 620 went into effect, Doe 5 would be unable to obtain admitting privileges in Baton Rouge. The plurality does so even though it is undisputed that the sole remaining step for him to obtain privileges is to find a doctor willing to cover for him-and that Doe 5 gave up on that effort after asking only one doctor. Similarly, the plurality takes it as given that Doe 2 would be denied admitting privileges even though he dropped a pending application when the hospital simply sent him a request for additional information. Maybe these physicians didn't feel it was worth putting in much effort to obtain admitting privileges given their chances of prevailing in this lawsuit. But it "taxes the credulity of the credulous" to think they would have treated the process so lightly if their livelihood depended on securing admitting privileges. Maryland v. King , 569 U.S. 435, 466, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013) (Scalia, J., dissenting). Cf. ante, at 2158 - 2160 (ALITO, J., dissenting).
That example only begins to illustrate the remarkably static view of the market on display here. Today's decision also appears to assume that, if Louisiana's law took effect, not a single hospital would amend its rules to permit abortion providers easier access to admitting privileges; no clinic would choose to relocate closer to a hospital that offers admitting privileges rather than permanently close its doors; the prospect of significant unmet demand would not prompt a single Louisiana doctor with established admitting privileges to begin performing abortions; and unmet demand would not induce even one out-of-state abortion provider to relocate to Louisiana.
All these assumptions are open to question. Hospitals can (and do) change their policies in response to regulations. Clinic operators have opened, closed, and relocated clinics numerous times. There are hundreds of OB/GYNs with active admitting privileges in Louisiana who could lawfully perform abortions tomorrow. Millions of Americans move between States every year to pursue their profession. Yet with conditions ripe for market entry and expansion, today's decision foresees nothing but clinic closures and unmet demand.
Not only questionable, the plurality's assumptions are already contradicted by emerging evidence. For example, a major hospital reacted to the law by developing a new type of admitting privileges expressly for an abortion provider seeking to comply with Act 620. Whether this type of privileges satisfies the statute is yet unknown-so, again assuming the worst, today's decision simply ignores the possibility. If nothing else, this development belies the prediction that hospitals statewide would stand idly by as thousands upon thousands of requests for abortions go unfulfilled.
What's more, as this suit was in progress, the State discovered two additional Louisiana abortion providers not reflected in the district court's opinion. No one disputes the accuracy of the State's information about these two providers. Nor could anyone deny the importance of this information, *2178 when so much of today's decision seems to turn on the exact quantity and distribution of a relatively small number of abortion providers. Normally, this Court might hesitate to deliver a fact-bound decision premised on facts we know to be incorrect. But today's decision, assuming the worst once more, simply proceeds as if these providers didn't exist.
If there is a silver lining, though, it may be here. This Court generally recognizes that facts can change over time-and that, when they do, legal conclusions based on them may have to change as well. Even so-called "permanent injunctions" are actually provisional-open to modification "to prevent the possibility that [they] may operate injuriously in the future." Glenn v. Field Packing Co. , 290 U.S. 177, 179, 54 S.Ct. 138, 78 L.Ed. 252 (1933) (per curiam ). After all, when the facts change, the law cannot pretend nothing has happened. For that reason, we have instructed lower courts to reconsider injunctions "when the party seeking relief ... can show a significant change either in factual conditions or in law." Agostini v. Felton , 521 U.S. 203, 215, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (internal quotation marks omitted). And, given the fact-intensive nature of today's analysis, the relief directed might well need to be reconsidered below if, for example, hospitals start offering qualifying admitting privileges to abortion providers, a handful of abortion providers relocate from other States, or even a tiny fraction of Louisiana's existing OB/GYNs decide to begin performing abortions. Given the post-trial developments Louisiana has already identified but no court has yet considered, there's every reason to think the factual context here is prone to significant changes.
*
Another background rule, another exception. When it comes to the factual record, litigants normally start the case on a clean slate. While a previous case's legal rules can create precedent binding in the current dispute, earlier "fact-bound" decisions typically "provide only minimal help when other courts consider" later cases with different factual "circumstances." Buford v. United States , 532 U.S. 59, 65-66, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001). We've long recognized that this arrangement is required by due process-because while the law binds everyone equally, parties are normally entitled to the chance to present evidence about their own unique factual circumstances. See Blonder-Tongue Laboratories, Inc. v. University of Ill. Foundation , 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).
No hint of these rules can be found in today's decision. From beginning to end, the plurality treats Whole Woman's Health 's fact-laden predictions about how a Texas law would impact the availability of abortion in that State in 2016 as if they obviously and necessarily applied to Louisiana in 2020. Most notably, the plurality cites Whole Woman's Health for the proposition that admitting privileges requirements offer no benefit when it comes to patient safety or otherwise. But Whole Woman's Health found an absence of benefit based only on the particular factual record before it. Nothing in the decision suggested that its conclusions about the costs and benefits of the Texas statute were universal principles of law, medicine, or economics true in all places and at all times. See, e.g., 579 U. S., at ---- - ----, ----, ---- - ----, 136 S.Ct., at (slip op., at 22-23, 26, 31-32). Yet that is exactly how the plurality treats those conclusions-all while leaving unmentioned the facts Louisiana amassed in an effort to show that its law promises patient benefits in this place at this time.
*2179 Not only does today's decision treat factual questions as if they were legal ones, it treats legal questions as if they were facts. We have previously explained that it would "be inconsistent with the idea of a unitary system of law" for the Supreme Court to defer to lower court legal holdings. Ornelas v. United States , 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Yet, the plurality today reviews for clear error not only the district court's findings about how the law will affect abortion access, but also the lower court's judgment that the law's effects impose a "substantial obstacle." The plurality defers not only to the district court's findings about the extent of the law's benefits, but also to the lower court's judgment that the benefits are so limited that the law's burden on abortion access is "undue." By declining to apply our normal de novo standard of review to questions of law like these, today's decision proceeds on the remarkable premise that, even if the district court was wrong on the law, a duly enacted statute must fall because the lower court wasn't clearly wrong.
*
After so much else, one might at least hope that the legal test lower courts are tasked with applying in this area turns out to be replicable and predictable. After all, "[l]iving under a rule of law entails various suppositions, one of which is that 'all persons are entitled to be informed as to what the State commands or forbids.' " Papachristou v. Jacksonville , 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (quotation modified). The existence of an administrable legal test even lies at the heart of what makes a case justiciable-as we have put it, federal courts may not entertain a question unless there are " 'judicially discoverable and manageable standards for resolving it.' " Rucho v. Common Cause , 588 U. S. ----, ----, 139 S.Ct. 2484, 204 L.Ed.2d 931 (2019) (slip op., at 11). Nor does the need for clear rules dissipate as the stakes grow. If anything, the judicial responsibility to avoid standardless decisionmaking is at its apex in " 'the most heated partisan issues.' " Id., at ----, 139 S.Ct., at (slip op., at 15).
Consider, for example, our precedents involving the First Amendment's right to free speech. In an effort to keep judges from straying into the political fray, this Court has provided a detailed roadmap: A court must determine whether protected speech is at issue, whether the restriction is content based or content neutral, whether the State's asserted interest is compelling or substantial, and whether the State might rely on less restrictive alternatives to achieve the same goals. At no point may a judge simply " 'balanc[e]' the governmental interests ... against the First Amendment rights" at stake because, as we have recognized, it would be "inappropriate" for any court "to label one as being more important or more substantial than the other." United States v. Robel , 389 U.S. 258, 268, n. 20, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). Any such raw balancing of competing social interests must be left to the legislature-"our inquiry is more circumscribed." Ibid. Nor is this idea unique to the First Amendment context. This Court has consistently rejected the idea that courts may decide constitutional issues by relying on "abstract opinions ... of the justice of the decision" or "of the merits of the legislation" at issue. Davidson v. New Orleans , 96 U.S. 97, 104, 24 L.Ed. 616 (1878).
By contrast, and as today's concurrence recognizes, the legal standard the plurality applies when it comes to admitting privileges for abortion clinics turns out to be exactly the sort of all-things-considered balancing of benefits and burdens this Court has long rejected. Really, it's little *2180 more than the judicial version of a hunter's stew: Throw in anything that looks interesting, stir, and season to taste. In another context, this Court has described the sort of decisionmaking on display today as "inherently , and therefore permanently , unpredictable." Crawford v. Washington , 541 U.S. 36, 68, n. 10, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Under its terms, "[w]hether a [burden] is deemed [undue] depends heavily on which factors the judge considers and how much weight he accords each of them." Id., at 63, 124 S.Ct. 1354.
What was true there turns out to be no less true here. The plurality sides with the district court in concluding that the time and cost some women might have to endure to obtain an abortion outweighs the benefits of Act 620. Perhaps the plurality sees that answer as obvious, given its apparent conclusion that the Act would offer the public no benefits of any kind. But for its test to provide any helpful guidance, it must be capable of resolving cases the plurality can't so easily dismiss. Suppose, for example, a factfinder credited the State's evidence of medical benefit, finding that a small number of women would obtain safer medical care if the law went into effect. But suppose the same factfinder also credited a plaintiff's evidence of burden, finding that a large number of women would have to endure longer wait times and farther drives, and that a very small number of women would be unable to obtain an abortion at all. How is a judge supposed to balance, say, a few women's emergency hysterectomies against many women spending extra hours travelling to a clinic? The plurality's test offers no guidance. Nor can it. The benefits and burdens are incommensurable, and they do not teach such things in law school.
When judges take it upon themselves to assess the raw costs and benefits of a new law or regulation, it can come as no surprise that "[s]ome courts wind up attaching the same significance to opposite facts," and even attaching the opposite significance to the same facts. Ibid. It can come as no surprise, either, that judges retreat to their underlying assumptions or moral intuitions when deciding whether a burden is undue. For what else is left?
Some judges have thrown up their hands at the task put to them by the Court in this area. If everything comes down to balancing costs against benefits, they have observed, "the only institution that can give an authoritative answer" is this Court, because the question isn't one of law at all and the only "balance" that matters is the one this Court strikes. Planned Parenthood of Ind. & Ky. v. Box , 949 F.3d 997, 999 (CA7 2019) (Easterbrook, J., concurring in denial of rehearing en banc). The lament is understandable. Missing here is exactly what judges usually depend on when asked to make tough calls: an administrable legal rule to follow, a neutral principle, something outside themselves to guide their decision.
*
Setting aside the other departures from the judicial process on display today, the concurrence suggests it can remedy at least this one. We don't need to resort to a raw balancing test to resolve today's dispute. A deeper respect for stare decisis and existing precedents, the concurrence assures us, supplies the key to a safe way out. Unfortunately, however, the reality proves more complicated.
Start with the concurrence's discussion of Whole Woman's Health . Immediately after paying homage to stare decisis , the concurrence refuses to follow the all-things-considered balancing test that decision employed when striking down Texas's admitting privileges law. In the process, the concurrence rightly recounts many of the problems with raw balancing tests. But *2181 then, switching directions again, the concurrence insists we are bound by an alternative holding in Whole Woman's Health . According to the concurrence, this alternative holding declared that the Texas law imposed an impermissible "substantial obstacle" to abortion access in light only of the burdens the law imposed-"independent of [any] discussion of [the law's] benefits." Ante, at 2138 - 2139 (ROBERTS, C. J., concurring in judgment). And, the concurrence concludes, because the facts of this suit look like those in Whole Woman's Health , we must find an impermissible substantial obstacle here too.
But in this footwork lie at least two missteps. For one, the facts of this suit cannot be so neatly reduced to Whole Woman's Health redux. See ante, at 2153 - 2155; ante, at 2157 - 2158, 2160 - 2166 (ALITO, J. dissenting). For another, Whole Woman's Health nowhere issued the alternative holding on which the concurrence pins its argument. At no point did the Court hold that the burdens imposed by the Texas law alone-divorced from any consideration of the law's benefits-could suffice to establish a substantial obstacle. To the contrary, Whole Woman's Health insisted that the substantial obstacle test "requires that courts consider the burdens a law imposes on abortion access together with the benefits th[e] la[w] confer[s]." 578 U. S., at ---- - ----, 136 S.Ct., at (emphasis added) (slip op., at 19-20). And whatever else respect for stare decisis might suggest, it cannot demand allegiance to a nonexistent ruling inconsistent with the approach actually taken by the Court.
The concurrence's fallback argument doesn't solve the problem either. So what if Whole Woman's Health rejected the benefits-free version of the "substantial obstacle" test the concurrence endorses? The concurrence assures us that Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), specified this form of the test, so we must (or at least may) do the same, whatever Whole Woman's Health says.
But here again, the concurrence rests on at least one mistaken premise. In the context of laws implicating only the State's interest in fetal life previability, the Casey plurality did describe its "undue burden" test as asking whether the law in question poses a substantial obstacle to abortion access. 505 U.S. at 878, 112 S.Ct. 2791. But when a State enacts a law "to further the health or safety of a woman seeking an abortion," the Casey plurality added a key qualification: Only "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." Ibid. (emphasis added). That qualification is clearly applicable here, yet the concurrence nowhere addresses it, applying instead a new test of its own creation. In the context of medical regulations, too, the concurrence's new test might even prove stricter than strict scrutiny. After all, it's possible for a regulation to survive strict scrutiny if it is narrowly tailored to advance a compelling state interest. And no one doubts that women's health can be such an interest. Yet, under the concurrence's test it seems possible that even the most compelling and narrowly tailored medical regulation would have to fail if it placed a substantial obstacle in the way of abortion access. Such a result would appear to create yet another discontinuity with Casey , which expressly disavowed any test as strict as strict scrutiny. Id., at 871, 112 S.Ct. 2791.
*
To arrive at today's result, rules must be brushed aside and shortcuts taken. While the concurrence parts ways with the plurality at the last turn, the road both travel leads us to a strangely open space, unconstrained *2182 by many of the neutral principles that normally govern the judicial process. The temptation to proceed this direction, closer with each step toward an unobstructed exercise of will, may be always with us, a danger inherent in judicial review. But it is an impulse this Court normally strives mightily to resist. Today, in a highly politicized and contentious arena, we prove unwilling, or perhaps unable, to resist that temptation. Either way, respectfully, it is a sign we have lost our way.